UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
ROBERT DORAN, BERNARD LINN, MARIA BAEZ,
and ALEXANDER SHAPOROV,

**Docket No.:**

                    Plaintiffs,

       -against-

**COMPLAINT**

NEW YORK STATE OFFICE OF THE MEDICAID
INSPECTOR GENERAL, DENNIS ROSEN,
DANIEL COYNE, ROBERT BYRNES,
CHRISTOPHER MULHALL, EDWARD
MICHAEL DRESSLER, SEAN MAHONEY,
GABRIELLE ARES, EDWARD J. MEYER and
JOHN and JANE DOES 1-5 (said names being
fictitious, the persons intended being those who aided
and abetted the unlawful conduct of the named
Defendants),

**JURY TRIAL REQUESTED**

                  Defendants.
-------------------------------------------------------------------X

      Plaintiffs by their attorneys, **MADUEGBUNA COOPER LLP**, complaining of the

Defendants, allege, upon information and belief, as follows:

    **I.**    **NATURE OF THIS ACTION**

    1.    On September 11, 2015, Plaintiffs, who are investigators at the Office of the

Medicaid Inspector General ("OMIG"), filed a federal discrimination and retaliation lawsuit

captioned as *Doran, et al. v. OMIG, et al.*, Dkt. No: 15-cv-7217 (PKC) (S.D.N.Y.) ("*Doran I*").

    2.    The lawsuit was set in motion by Anna Coschignano's short and rocky tenure as

head of OMIG's Division of Medicaid Investigations from 2012 to 2014.

    3.    Under Coschignano's leadership, unnecessarily endangering its employees, OMIG

began promoting investigators with no interviews or documented process, in violation of OMIG's

internal policies and rules, by selecting younger, unqualified candidates and those that share

Coschignano's Italian ancestry and were her prior acquaintances.

4.      In doing so, OMIG and Coschignano violated workplace safety rules and regulations designed to protect employees at OMIG from unlawful discrimination and retaliation.

5.      Following internal complaints and outcry from a diverse group of OMIG employees that rules and regulations were being violated which needlessly endangered their livelihood, OMIG began holding sham, pre-determined interviews to shield themselves from scrutiny and legal liability.

6.      In a futile attempt to improve the situation, investigators like Plaintiffs and their union continued voicing opposition, requested union hearings to investigate hiring decisions, filed internal grievances, held a public rally and filed complaints with external agencies.

7.      After OMIG ignored these measures, Plaintiffs filed *Doran I* to challenge a culture of biased and irregular hiring procedures that was used to deny them promotions and retaliate against them for filing internal discrimination complaints on the basis of age, race, and national origin.

8.      Since filing *Doran I* in 2015, Defendants have continued to deny Plaintiffs promotions in retaliation for their complaints and discretely created for Plaintiffs more onerous working conditions.

9.      With some of the 2015 claims from *Doran I* headed for trial this year, Defendants still refuse to change their ways and fix their irregular and biased promotional process. Instead, Defendants continue to violate workplace safety rules and regulations designed to protect employees at OMIG from unlawful discrimination and retaliation.

10.     Defendants continue to disregard merit and their internal policies in favor of promoting younger employees or those that have not made or supported internal or external discrimination complaints.

11.     In fact, *Doran I* has only hardened OMIG's resolve to blackball those who seek a more just and fair workplace, leaving top-level OMIG managers to hide in their offices with "no whining" signs on their tightly closed office doors.

12.     Due to Defendants' refusal to change their broken system and be faithful stewards of public funds, Plaintiffs are now forced to file this second lawsuit to protect their rights and those of their fellow investigators, and stop OMIG from unnecessarily endangering the public or our community.

13.     As a result, Plaintiffs bring this action to enforce their rights under the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA"); Civil Rights Act of 1871, 42 U.S.C. § 1983 ("Section 1983") and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution ("Equal Protection Clause"); the New York State Human Rights Law as contained in New York State Executive Law, § 296, *et seq.* ("NYSHRL"); and New York City Human Rights Law as contained in the Administrative Code of the City of New York, § 8-107, *et seq.* ("NYCHRL"), providing for injunctive relief and other relief against age discrimination and in retaliation for engaging in protected activity.

## II.    <u>JURISDICTION AND VENUE</u>

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 and 29 U.S.C. § 2617(a)(2).

15.     Plaintiffs further invoke this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over all State and City law claims related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

16.     Venue is proper in the United States District Court for the Southern District of New York because Defendants conduct business in this District, and the acts and/or omissions giving rise to the claims herein alleged took place in this District.

### III.     PROCEDURAL REQUIREMENTS

17.     Prior to filing this action, Doran's claims under the ADEA satisfied all conditions precedent, including filing a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission pursuant to the ADEA, and receipt of a Right to Sue Notice.

18.     This lawsuit was commenced within 90 days of receipt of the Right to Sue Notice.

19.     After commencing this action, Plaintiffs will serve a copy of the complaint upon the New York City Commission of Human Rights and the Corporation Counsel of the City of New York, in accordance with New York City Administrative Code Section 8-502(c).

### IV.     PARTIES

### A.     Plaintiffs' General Work Duties

20.     Plaintiffs are four individuals working for the State of New York ("State") and employed by Defendant OMIG.

21.     Plaintiffs are stationed in OMIG's New York City Office at 90 Church Street, New York, New York ("NYC Office") as Medicaid Investigators and Management Specialists within the Division of Medicaid Investigations ("DMI").

22.     As part of DMI, Plaintiffs perform and supervise Medicaid fraud investigations.

23.     DMI ensures the integrity of the Medicaid program by investigating, recovering overpayments and implementing administrative sanctions against providers.

24.     Medicaid Investigators use data analysis, interviewing, billing and medical chart review, financial audits, and undercover surveillance to investigate providers for fraud.

**B.**   **Individual Plaintiffs**

25.   Plaintiff Robert G. Doran ("Doran") is a white male, currently aged 63 years, and a resident of Rockville Centre, New York.

26.   Doran holds an undergraduate degree in Accounting and Management from Adelphi University and is a graduate of the Criminal Investigator School and IRS Special Agent School from the Federal Law Enforcement Training Center in Glynco, Georgia.

27.   Doran has over 35 years of experience working for Federal and State agencies, including OMIG, the Internal Revenue Service of the U.S. Department of Treasury ("IRS"), and the New York State Department of Labor.

28.   Since 2009, Doran has been continuously employed at OMIG.

29.   On February 5, 2009, Doran started with OMIG as a Medicaid Investigator, Level 1 ("MI-1") in the NYC Office.[1]

30.   In May 2010, *before* Coschignano became DMIG, Doran was promoted to MI-2.[2]

31.   Doran currently holds the civil service title of MI-2 at OMIG, which he has held for over ten years, with pay retention at Grade 21.

32.   However, MI-1 and MI-2 positions are now called an "Investigative Specialist 1" with different levels of pay grades based on a revised civil service scale.

33.   At all times relevant, Doran performed the duties of a Medicaid Investigator, with responsibility for investigating Medicaid fraud under OMIG guidelines.

---

[1] MI-1s conduct routine and standard undercover investigations where the elements of the case and law are straightforward.

[2] MI-2s perform more difficult investigations where the Medicaid law requires interpretation or where the facts are not firmly established, and function as team leaders for MI-1s.

34.     Plaintiff Bernard Linn ("Linn") is a 68-year-old white man of Jewish heritage and ancestry, and a resident of Cedarhurst, New York.

35.     Linn holds both an undergraduate degree in Political Science and a Master's degree in Accounting from Long Island University.

36.     Linn has over 40 years of experience as a public servant.

37.     Since March 30, 1978, Linn has been employed by OMIG (and its predecessor agencies) as a Management Specialist, Level 1 ("MS") and then as an MS-2 since 2006 in the Division of Audit and DMI.

38.     At all times relevant, Linn performed the duties of a MS-2, with responsibilities that include conducting investigations of Medicaid fraud.

39.     Plaintiff Maria Baez ("Baez") is a Hispanic woman and resident of East Stroudsberg, Pennsylvania.

40.     Baez was born in Puerto Rico and moved to the mainland United States when she was two.

41.     Baez holds a bachelor's degree in Criminal Justice from Mercy College in New York.

42.     For over sixteen years, Baez has been a public servant working for State and public agencies, such as the Bureau of Fraud Investigation ("BFI") of the City of New York's Human Resources Administration.

43.     Prior to OMIG, Baez worked as a Welfare Fraud Investigator-2 with BFI for over ten years, and rose to the position of Associate Fraud Investigator, a supervisory position, which she held for ten months until joining OMIG in August 2008.

44.     Since August 2008, Baez has been continuously employed by OMIG as an MI-2 in DMI.

45.     At all times relevant, Baez was a Medicaid Investigator, with responsibility for investigating allegations of Medicaid fraud.

46.     Plaintiff Alexander Shaporov ("Shaporov") is a white male and resident of Brooklyn, New York.

47.     Shaporov was born in Russia and immigrated to the United States at age thirteen.

48.     Shaporov holds an undergraduate degree in Criminal Justice and Masters of Public Administration in forensic investigations and auditing from John Jay University, and a Certificate in Pharmaceutical and Medical Device Law Compliance from Seton Hall University.

49.     He is certified as a Fraud Examiner by the Association of Certified Fraud Examiners.

50.     Since February 5, 2009, Shaporov has been continuously employed by OMIG in various capacities, including MI-1 and MI-2 in DMI.

51.     Shaporov currently holds the civil service title of MI-2, a title he has held for nearly six years since 2014.

52.     At all times relevant, Shaporov performed the duties of a Medicaid Investigator, with responsibility for investigating Medicaid fraud under OMIG guidelines.

**C.     Defendants**

53.     Defendant OMIG is an agency of the State of New York and an independent entity created within the New York State Department of Health ("DOH") to protect the Medicaid program by conducting fraud, waste, and abuse control activities for all State agencies responsible for services that Medicaid funds.

54.    OMIG is a relatively small state agency, with about 400 employees.

55.    Defendant DENNIS ROSEN ("ROSEN") is the current Inspector General of OMIG since Governor Andrew Cuomo appointed him in or about January 2015.

56.    Upon information and belief, ROSEN has appointing authority and final authority for policymaking and personnel decisions under New York Public Health Law § 32.

57.    ROSEN is also an attorney licensed in New York State.

58.    ROSEN is sued in his personal capacity for monetary damages and in his official capacity for injunctive relief.

59.    Defendant DANIEL COYNE ("COYNE") is a white male.

60.    Since 2017, COYNE has been Deputy Medicaid Inspector General for Investigations ("DMIG") stationed in the NYC Office.

61.    COYNE is also an attorney licensed in New York State.

62.    COYNE was appointed by and reports directly to ROSEN.

63.    COYNE has authority to make personnel changes including promotions, demotions, reassignments, and obtaining salary increases for DMI employees.

64.    COYNE is sued in his official capacity for injunctive relief and in his individual capacity for monetary damages.

65.    Defendant ROBERT BYRNES ("BYRNES") is a white male.

66.    BYRNES was, at all times relevant, a MI-4 and then a MI-5 with OMIG, and served as the Assistant Medicaid Investigator in Charge for the NYC Office until his retirement in or around November 2018.

67.    BYRNES is sued in his individual capacity for monetary damages.

68.    Defendant CHRISTOPHER MULHALL ("MULHALL") is a white male.

69. MULHALL is and was, at all relevant times, an Assistant Medicaid Inspector General in DMI.

70. MULHALL works in OMIG's Albany office and is in charge of DMI staff located Upstate.

71. MULHALL is sued in his individual capacity for money damages.

72. In violation of OMIG policy, MULHALL was hired at OMIG due to his prior connection with Coschignano, without any formal recruitment or interviewing.

73. Defendant EDWARD MICHAEL DRESSLER ("DRESSLER") is a white male.

74. DRESSLER is and was, at all relevant times, an Assistant Medicaid Investigator in Charge, MI-4 and reports directly to COYNE.

75. DRESSLER is an attorney licensed to practice in Massachusetts.

76. DRESSLER is sued in his individual capacity for money damages.

77. Defendant SEAN MAHONEY ("MAHONEY") is a white male.

78. MAHONEY is and was, at all relevant times, an Investigative Specialist 2, and reports directly to DRESSLER.

79. MAHONEY is sued in his individual capacity for money damages.

80. Defendant GABRIELLE ARES is a white female.

81. Since December 2016, and at all times relevant, ARES was and is the head of OMIG's Division of Administration and holds the title of Deputy Medicaid Inspector General.

82. ARES reports directly to ROSEN.

83. ARES is sued in her individual capacity for money damages.

84. Defendant EDWARD J. MEYER ("MEYER") is a white male.

85.     At all times relevant, MEYER was and is the Chief of Investigations for OMIG's Albany Office.

86.     MEYER reports directly to COYNE and indirectly to ROSEN.

87.     MEYER is sued in his individual capacity for money damages.

88.     Upon information and belief, at all relevant times, Defendants ROSEN, COYNE, MULHALL, BYRNES, DRESSLER, MEYERS and ARES are responsible for developing, implementing and enforcing personnel policies and procedures affecting the terms and conditions of employment of employees within OMIG, including the Plaintiffs.

## V.      **FACTS COMMON TO ALL CLAIMS**

### A.     **Defendants' Discriminatory Employment Practices**

89.     Before 2012, few, if any, discrimination claims were filed internally or externally by DMI investigators in the NYC Office.

90.     That all changed in the Spring of 2012, when Anna Coschignano was selected to oversee DMI by her former colleague and friend, then-Medicaid Inspector General James Cox ("Cox").

91.     Coschignano, during her short and rocky tenure from April 2012 to October 2014, with Cox's blessing, began hiring and promoting unlawfully favored employees, mostly younger and white-Caucasian employees and individuals.

92.     Coschignano said she wanted to fill OMIG with young blood and set about hiring and promoting employees in ways that violated workplace safety rules and regulations designed to protect employees at OMIG from unlawful discrimination and retaliation.

93.     Coschignano circumvented OMIG's rules and policies about recruitment and began hand-picking candidates to promote without holding interviews or using any formal process.

94.     In one of her first personnel acts at OMIG, Coschignano took away the promotion of an older, African American DMI investigator named Glendon Griffith ("Griffith") that had been decided after a full interview process and gave it to a white male employee in his thirties that was less qualified and had previously worked security for J.Crew without any interviews.

95.     As a result, in 2014, Griffith filed a federal lawsuit for race, national origin and age discrimination. *See Griffith v. OMIG, et al.*, Dkt. No. 1:14-cv-011228 (N.D.N.Y.).[3]

96.     Griffiths has not been promoted since filing his lawsuit.[4]

97.     After DMI employees and their union, the Public Employees Federation ("PEF"), began complaining and protesting the discrimination, Coschignano eventually hired a new manager that she was friendly with and admitted he was hired to clean house and, in effect, antagonize a group of employees that were minorities or had complained about discrimination or opposed Coschignano's hiring practices as unfair.

98.     OMIG and Coschignano also generally refused to promote any DMI employee that had engaged in or supported protected activity.

99.     To end the complaints and publicity, OMIG and Coschignano made a few quick minority promotions while refusing to address the underlying problem of OMIG ignoring its own recruitment policies and selecting candidates based on unlawful criteria.

100.    In February 2014, DMI investigators filed a group grievance due to OMIG's discriminatory practices.

---

[3] *See* "Racial discrimination case against the state drawing to a close," Rick Karlin, TIMES UNION, March 15, 2018, *available at* https://www.timesunion.com/news/article/Racial-discrimination-case-against-the-state-is-12756592.php
[4] After defeating OMIG's summary judgment motion in part, Griffiths eventually lost at trial before a federal jury in the Northern District of New York sitting in Albany. Griffiths' loss emboldened OMIG and Defendants and spurred further unlawfulness by OMIG supervisors, including jokes about discrimination lawsuits.

101.     At the same time, PEF Union leader Usher Piller sent a letter to Cox and OMIG stating that "recent promotions in OMIG have unleashed a torrent of pent up resentment among employees, especially Medicaid Investigators, who allege the existence of a culture of racism and ageism that has been festering a long time."

102.     On May 1, 2014, PEF held a rally outside the NYC Office to protest the discriminatory practices and seek Cox's resignation.[5]

103.     Coschignano warned Shaporov not to attend the rally and said participating could jeopardize his career, adding that there would be consequences if employees go to the rally.

104.     By August 2014, Cox decided to resign from OMIG and officially stepped down in November 2014.

105.     Also in August 2014, Coschignano told Cox she would resign along with him and stepped down in or around October 2014.

106.     Faced with continuing grievances, COYNE said in 2015 that OMIG would train Management Specialists to investigate in order to undermine the necessity of the Investigators who continued to oppose OMIG's discriminatory employment practices.

107.     Sure enough, Defendants began undermining the Investigators by using Management Specialists like Vivian Campbell, who had not made or supported discrimination complaints, to carry out the work of DMI, despite lacking similar investigative experience.

**B.     Plaintiffs' Prior Protected Activity**

108.      Defendants are aware that on September 11, 2015, Plaintiffs filed *Doran I* against several individual defendants – including current and former supervisors at OMIG and ROSEN.

---

[5] *See* "OMIG director target of protest," James M. Odato, TIMES UNION, May 1, 2014, *available at* https://blog.timesunion.com/capitol/archives/211742/omig-director-target-of-protest/

109.    Defendants are also aware that in *Doran I*, Plaintiffs made claims for promotion denials on the basis of age, race, national origin and retaliation for internal discrimination complaints.

110.    In or around March 2015, ROSEN became Medicaid Inspector General and largely continued Coschignano's and Cox's retaliatory practices while refusing to settle *Doran I* or improve OMIG's promotional practices.

111.    Since *Doran I* was filed in 2015, OMIG has blackballed all DMI employees that opposed discrimination or supported their co-workers' or PEF's efforts to combat discrimination.

112.    Since *Doran I* was filed, no such DMI employee has been promoted or viewed favorably by OMIG and the individual defendants, including Doran, Baez, Shaporov, Linn, Nigell Johnson, Glendon Griffith, Glen Henry Ross, Michael Tate, Anthony Murphy, Tatyana Mykich and Andrey Mykich.

113.    In addition, ROSEN and others at OMIG have largely treated workplace discrimination as a joke.

114.    In 2014, when Doran complained to BYRNES about violation of his civil rights, BYRNES replied "you don't have any civil rights and I don't care."

115.    In September 2016, ROSEN helped demote a black attorney at OMIG that opposed the racist behavior and harassment of a white attorney that ROSEN favored, protected and met with many times privately in his office.[6]

116.    ROSEN belittled the *Doran I* lawsuit by telling OMIG employees during a meeting, in reference to Linn, don't talk to him or he'll sue you.

---

[6] *See* "Cuomo Medicaid boss overlooked alleged racism: suit," NEW YORK POST, Kaja Whitehouse, Jan. 9, 2019, *available at* https://nypost.com/2019/01/09/cuomo-medicaid-boss-overlooked-alleged-racism-suit/

117.    Around the same time, ROSEN would openly mock Griffith for filing his lawsuit by asking sarcastically, "are you going to sue me?"

118.    On another occasion, ROSEN also stated during a meeting, in reference to *Doran I* and the Plaintiffs, that he did not like people that complain or file grievances because they are whiners.

119.    At other times, ROSEN expressed disregard for anti-discrimination laws and issues in the workplace, commenting that one African American employee saw everything as "black and white" when she raised concerns about racial bias at OMIG and said, "Oh, just let them sue."

120.    Prior to joining OMIG, when ROSEN was Chairman of the New York State Liquor Authority, about six Hispanic employees filed an internal discrimination complaint after being called racial slurs at work by white employees.

121.    When some of the Hispanic employees threatened to file a lawsuit over the treatment and retaliation for their internal complaints, during a labor meeting, ROSEN publicly dared them to file the lawsuit because he claimed to have compromising information on the Hispanic employees.

122.    On February 6, 2019, OMIG employees publicly protested bias and discrimination at OMIG under ROSEN.[7]

123.    On September 27, 2019, in *Doran I*, the U.S. District Court granted in part and denied in part Defendants' motion for summary judgement, and some of Plaintiffs' claims, including discriminatory and retaliatory denials of promotions, are presently waiting for trial. *See Doran v. OMIG, et al.*, No.: 15-cv-7217 (PKC), 2019 WL 473584 (S.D.N.Y. Sept. 27, 2019).

---

[7] *See* "A Long-Running Problem:  OMIG Employees Say Agency Bias Rampant," Richard Khavkine, THE CHIEF, Feb. 22, 2019, *available at* https://thechiefleader.com/news/news_of_the_week/omig-employees-say-agency-bias-rampant/article_d74a546a-36bc-11e9-9743-cbcfaf9e8e71.html

## VI.    CLAIMS OF INDIVIDUAL PLAINTIFFS

### A.    Plaintiff Doran

#### i.    Doran's Employment Background

124.    Prior to OMIG, Doran was a Senior Special Agent with the IRS Criminal Investigation Division.

125.    Doran achieved a long and distinguished career at the IRS, earning strong performance reviews and several promotions as well as increased responsibilities at each level.

126.    At the IRS, Doran gained more than 20 years' experience in fraud investigation, rising to the positions of Acting Supervisory Special Agent, Lead Special Agent, and On-the-Job Instructor.

127.    On February 5, 2009, Doran started with OMIG as an MI-1 in the NYC Office.

128.    In May 2010, *before* Coschignano became DMIG, Doran was promoted to MI-2.

129.    Since May 2010, Doran has been an MI-2.

130.    At all times relevant, Doran performed the duties of a Medicaid Investigator, with responsibility for investigating Medicaid fraud under OMIG guidelines, and was key in OMIG's successful execution of the well-publicized Oceana Project and Roslyn Heights Project.[8]

131.    From October 2010 to April 2014, following the departure of an MI-3 supervisor, Doran assumed his supervisory duties and oversaw about ten investigators with no pay increase.

132.    Medicaid Investigator, Level 3 ("MI-3") is a supervisory position and performs the same functions and duties as MI-2s but have additional supervisory and administrative duties over MI-2s and MI-1s. The position is now called an "Investigative Specialist 2."

---

[8] *See e.g.* "Six-residents-at-luxury-brighton-beach-condo-complex-busted-for-medicaid-fraud," Isabel Vincent, NEW YORK POST, Aug. 11, 2013 *available at* https://nypost.com/2013/08/11/six-residents-at-luxury-brighton-beach-condo-complex-busted-for-medicaid-fraud/

133.    As an acting MI-3 supervisor, Doran received strong evaluations.

134.    For example, Doran's 2010-2011 performance evaluation by Fern DePaulo and BYRNES described him as "an outstanding employee" and noted his work "as the lead OMIG investigator on a major investigation being conducted by the New York County DA's Office."

135.    The 2010-2011 evaluation found that "Doran has shown himself to be the consummate professional in mentoring, training and developing investigative staff." The evaluation also remarked that "Doran's written and oral communication is of the highest order. His written and oral reports are perfectly clear and concise."

136.    Overall, Doran's 2012, 2013 and 2014 performance evaluations, signed by DePaulo and BYRNES, all recommended Doran for promotion to MI-3, finding that he was an "exceptional" or "outstanding" employee.

137.    Since 2013 and the filing of *Doran I*, each time Doran applied for a position with a higher salary, he was denied a promotion.

138.    In retaliation for filing *Doran I*, defendants in that lawsuit, including ROSEN, continued to subject Doran to discriminatory and retaliatory acts, including promotion denials.

139.    Prior to Coschignano becoming DMIG, Doran had never filed a discrimination complaint at any job.

### ii.  November 2017 DMIG Promotion Denial (Background Allegation)

140.    In or around May 2017, an opening was posted for the DMIG position in DMI.

141.    In or around May 2017, Doran applied for the DMIG position.

142.    Doran was interviewed by ROSEN and Erin Ives ("Ives"), the Acting First Deputy Medicaid Inspector General.

143.    Despite his superior qualifications, Doran was not selected as DMIG.

144.    Instead, in or about November 2017, ROSEN selected COYNE, a younger and less qualified male who had not engaged in protected activity complaining of discrimination.

145.    Selecting COYNE over Doran was retaliation for Doran's discrimination complaints, including *Doran I*.

146.    At the time of his appointment in 2017, COYNE was 45 years-old and Doran was 61 years-old.

147.    Doran was significantly more qualified for the DMIG position than COYNE.

148.    Doran had more than twice as many years' experience conducting and overseeing Medicaid investigations than COYNE at OMIG.

149.    While the DMIG position required "substantial investigative experience," Doran had over 20 years of investigative experience as an IRS agent while Coyne only had, at most, a few years of experience.

150.    Despite inviting Doran for an interview, ROSEN refused to conduct an actual interview of Doran. ROSEN wrote nothing down that Doran said during the meeting, had no prepared questions, and asked no substantive questions about Doran's work experience or qualifications.

151.    Instead, ROSEN told Doran he could talk about whatever he wanted. When Doran attempted to speak about his experience and substantive issues impacting the DMIG position, ROSEN did not take the conversation seriously.

152.    ROSEN also asked Doran how old he was.

153.    Ives said nothing and asked Doran no questions during the interview.

154.    Overall, ROSEN's behavior during the interview informed Doran that he was not being seriously considered for the DMIG position due to his age and discrimination complaints.

155.    As stated above, prior to Doran's May 2017 DMIG interview, ROSEN expressed retaliatory animus towards Plaintiffs and other OMIG employees for complaining about discrimination.

### iii.  Doran's Promotion Denial No. 1:  2019 AMIG Position

156.    In or around September 2018, Doran applied for a promotion to Assistant Medicaid Inspector General for Investigations ("AMIG") in OMIG's NYC Office.

157.    The AMIG is second-in-command for Medicaid investigations in New York and is typically reserved for candidates with extensive investigative experience.

158.    In 2018, OMIG, with the involvement of ROSEN, COYNE and ARES, gutted the AMIG qualifications and designed the posting to pre-select an employee that had not complained about discrimination and was grossly unqualified.

159.    After applying, Doran noticed that OMIG, with the involvement of ROSEN, COYNE and ARES, removed the requirement from 2013 that applicants must have a minimum of 14 years' investigative experience.

160.    Instead, the 2018 AMIG posting required no investigative experience even though the AMIG's primary duty is to oversee investigations in DMI.

161.    The 2018 AMIG posting also removed any requirement or preference for candidates with supervisory experience.

162.    OMIG also removed the preference for a candidate with experience on "surveillance/monitoring" of medical providers.

163.    OMIG also changed the preferred education from accounting and criminal justice to include "a health care related field."

164.    The preference for an accounting degree was removed – which is the degree Doran

holds.

165.     On or around November 9, 2018, Doran was interviewed by COYNE and ARES.

166.     During the interview, Doran asked if the New York State Department of Civil Service approved the drastic changes to the minimum qualifications.

167.     Without answering, ARES looked at Doran with a stunned expression.

168.     On April 11, 2019, Doran learned that he was denied the position.

169.     OMIG, at the direction of ROSEN, selected a younger candidate named Stephanie Paton, who came from a nursing background and had no investigative experience.

170.     The decision to select Paton was made by ROSEN, COYNE and ARES.

171.     Upon information and belief, Ms. Paton has never engaged in any protected activity at OMIG claiming discrimination or retaliation.

172.     Much differently, ROSEN had commented, before the recruitment process, that he "needed someone he could trust," in reference to Ms. Paton.

173.     Ms. Paton's promotion is part of a pattern where OMIG, under the direction of ROSEN, pre-selects candidates and holds interviews only to avoid scrutiny when they violate anti-discrimination and anti-retaliation laws.

174.     OMIG has done this within DMI and other divisions.

175.     In this case, the job posting was changed to fit Ms. Paton's nursing background at the direction of ROSEN and in order to prevent highly-qualified candidates like Doran, who have complained of discrimination, from obtaining promotions.

176.     Ms. Paton's selection is also part of a strategy to shift DMI leadership positions from the NYC office to the Albany office that is not rife with protected activity by investigators. The 2018 posting states this intention: "the AMIG will be based in NYC, but will maintain a

- 19 -

regular presence in Albany."

177.    In fact, Ms. Paton actually lives Upstate and only spends a few days each week in the NYC Office.

178.    In another example, in or around 2019, ROSEN and the Defendants transferred a supervisor from the DMI Albany office to avoid promoting an investigator from the NYC Office even though the transferred employee had a restraining order against him in Albany and subsequently workplace violence complaints were filed against him by female investigators in the NYC Office based on his intimidating and erratic behavior.

### iv.  Doran's Promotion Denial No. 2:  Manager of Medicaid Investigations

179.    In the fall of 2018, Doran applied to be DMI's NYC Manager of Medicaid Investigations.

180.    In or around November 8, 2018, Doran was interviewed by COYNE, MULHALL and ARES.

181.    In retaliation for his protected activity, on April 11, 2019, Doran learned that he was denied the position because OMIG, at the direction of ROSEN, recruited externally to hire Eunice Green, a former OMIG employee.

182.    The decision to select Ms. Green was made by ROSEN, COYNE, MULHALL and ARES.

183.    Upon information and belief, Ms. Green has never engaged in any protected activity at OMIG claiming discrimination or retaliation.

184.    Ms. Green is less qualified for the position than Doran, given his over 25 years of qualifying investigative field experience.

185.    OMIG, at the direction of ROSEN, intentionally recruited outside of OMIG to

avoid hiring Doran or other coworkers from DMI's NYC Office who have complained of discrimination or retaliation or supported their co-workers' complaints.

186.    The decision not to select Doran was made in retaliation for his prior protected activity by ROSEN, COYNE, MULHALL and ARES.

### v.  Doran's Promotion Denial No. 3:  Investigative Specialist 2

187.    In retaliation for *Doran I*, Doran was denied promotion to the position of Investigative Specialist 2 (Grade 23), a supervisory position, in favor of a less-qualified candidate who did not engage in protected activity.

188.    In or around September 2018, Doran applied for the Investigative Specialist 2 position in OMIG's NYC Office.

189.    The 2018 posting removed any requirement or preference for candidates with a degree in accounting, criminal justice, or a related field, which Doran had.

190.    The 2018 posting also reduced the requirement of 10 years' investigative experience to only 7 years.

191.    In or around October 3, 2018, Doran was interviewed by Chief of Investigations MEYER from OMIG's Albany Office and two auditors named Nancy Schmidt and Henry Stambuli ("Stambuli").

192.    MEYER told Doran that COYNE would be making the promotion decision, but then began telling candidates that he and the interview panel would make the decision.

193.    In or around November 2018, Doran learned that he was denied the position.

194.    OMIG, at the direction of COYNE, and with the approval of ROSEN, selected Mildred Palermo, who had only worked at OMIG a short period and had been the subject of workplace violence complaints.

195.    Upon information and belief, Ms. Palermo has never engaged in any protected activity at OMIG claiming discrimination.

196.    Much differently, Ms. Palermo had a history of loyalty to COYNE's family.

197.    In comparison, when Nigill Johnson – an African American employee with a history of producing excellent investigative results[9] and who is vocal about discrimination at OMIG and filed several internal discrimination complaints – arrived for her interview, Stambuli said that he had heard about Nigill Johnson and did not know how he could say anything good about her during the interview for Investigative Specialist 3.

**B.    Retaliation Against Plaintiff Linn**

**i.    Linn's Employment Background**

198.    In 1978, Linn began working for the Department of Social Services as a Management Specialist and in 1982 became a Management Specialist 1.

199.    For the first five years, Linn investigated whether Medicaid and welfare recipients were receiving the proper level of aid for their income by conducting home visits and drive-bys of houses, trying to locate absent fathers, and investigating employment or unreported assets.

200.    In 1984, Linn, as a team leader of five other employees, began working in audits, which involved auditing welfare providers' records and payments.

201.    From 1988 to 1999, Linn worked as a team leader in a Fraud & Abuse unit conducting Credential Verification Reviews by interviewing doctors and staff at medical facilities. Additionally, Linn conducted other investigations where he would conduct surveillance of

---

[9] *See e.g.* A.G. Schneiderman Announces Arrest Of Bronx Clinic Owner For Alleged Five Million Dollar Medicaid Fraud *available at* https://ag.ny.gov/press-release/2016/ag-schneiderman-announces-arrest-bronx-clinic-owner-alleged-five-million-dollar

ambulette passengers and created video recordings, and performed undercover work buying prescription drugs on the street to obtain intelligence about doctors writing prescriptions.

202.    In 1999, Linn returned to the audit unit, where he focused on special projects that were investigatory audits and pharmacy audits.

203.    In 2006, Linn was promoted to a Management Specialist 2 and began supervising two audit teams comprised of three to four employees each, for a total of six to eight employees, in addition to supervising an extra trainee or two.

204.    As a supervisor of audit teams from 2006 to 2012, Linn was responsible for leading the audit teams of Medicaid providers, assigning cases, approving leave for the teams, arranging training, overseeing time reports and conducting evaluations.

205.    In 2012, Linn's work switched from the auditing division to investigations with conducting pharmacy inspections for DMI. Linn also conducted undercover surveillance operations for DMI.

206.    Linn's work in DMI also included developing targets by going to pharmacies and doctors to find providers who were illegally distributing drugs like Oxycontin and develop informants.

207.    In Linn's performance evaluation for 2012 to 2013, Coschignano wrote that Linn had "exceptional interpersonal skills which is evidenced by several significant successes during this rating period" and "works diligently to meet the goals of the Pharmacy Unit. He thinks both 'inside and outside the box'" and was "extremely tenacious and focused" when given special projects, issued reports that were "clear and concise" and contained no complaints about his supervision of other employees.

208.     Prior to Coschignano becoming DMIG, Linn had never filed a grievance for discrimination or had problems with retaliation.

### ii.  Linn's Promotion Denial No. 1:  2019 AMIG Position

209.     In or around September 2018, Linn applied for a promotion to AMIG in the NYC Office.

210.     OMIG removed the preferred education field of accounting – which Linn holds a degree in – and switched it to "a health care related field."

211.     In or around November 2018, Linn was interviewed by COYNE and ARES.

212.     On or about April 11, 2019, Linn learned that he was denied the position.

213.     OMIG, at the direction of ROSEN, selected a younger candidate named Stephanie Paton, who came from a nursing background and had no investigative experience.

214.     The decision to select Paton was made by ROSEN, COYNE and ARES.

215.     ROSEN, COYNE and ARES are aware that Linn is considerably older than Ms. Paton.

216.     Upon information and belief, Ms. Paton has never engaged in any protected activity at OMIG claiming discrimination or retaliation unlike Linn.

### iii.  Linn's Promotion Denial No. 2:  Manager of Medicaid Investigations

217.     In the fall of 2018, Linn applied to be DMI's NYC Office Manager of Medicaid Investigations.

218.     In or around November 2018, Linn was interviewed by COYNE, MULHALL and ARES.

219.     In retaliation for his protected activity, on or about April 11, 2019, Linn learned that he was denied the position because OMIG, at the direction of ROSEN, recruited externally to

hire Eunice Green, a former OMIG employee.

220.    The decision to select Ms. Green was made by ROSEN, COYNE, MULHALL and ARES.

221.    Upon information and belief, Ms. Green has never engaged in any protected activity at OMIG claiming discrimination or retaliation.

222.    Ms. Green is less qualified for the position than Linn given his over 40 years of qualifying investigative field experience.

223.    OMIG, at the direction of ROSEN, intentionally recruited outside of OMIG to avoid hiring Linn or other coworkers from DMI's NYC Office who have complained of discrimination or retaliation or supported their co-worker's complaints.

224.    The decision not to select Linn was made in retaliation for his prior protected activity by ROSEN, COYNE, MULHALL and ARES.

### iv.  Linn's Promotion Denial No. 3:  Investigative Specialist 2

225.    In retaliation for *Doran I*, Linn was denied a lateral transfer to the position of Investigative Specialist 2 (Grade 23), a supervisory position, in favor of a less-qualified candidate who did not engage in protected activity and had never held a supervisory position at OMIG.

226.    In or around September 2018, Linn applied for the Investigative Specialist 2 position in the NYC Office because, although he currently holds a supervisory title, OMIG has been denying him staff to supervise in his current role.

227.    The 2018 posting removed any requirement or preference for candidates with a degree in accounting, criminal justice, or a related field, which Linn had.

228.    In or around October 3, 2018, Linn was interviewed by MEYER and two auditors.

229.    In or around November 2018, Linn learned that he was denied the position.

230.     OMIG, at the direction of COYNE, and with ROSEN's approval, selected Mildred

Palermo, who had only worked at OMIG a short period and had been the subject of workplace

violence complaints.

**C.      Retaliation Against Plaintiff Baez**

      **i.   Baez Employment Background**

231.     Baez is 46 years old and has nearly twelve years of continuous employment with

OMIG.

232.     Defendants have refused to promote Baez for the past twelve years, and her career

advancement has stagnated.

233.     Since August 18, 2008, Baez has been employed by OMIG as an MI-2 in DMI.

234.     From August 2008 to 2010, Baez was supervising investigator and oversaw *Qui*

*Tam* cases and Medicaid fraud investigations while supervising four state contractors.

235.     In 2009, as a supervisor, Baez's supervisor, Fern DePaulo, and BYRNES found

that she "is a self-starter and is highly effective in her new position of supervisor" and "very

competent" at supervising undercover staff. DePaulo and BYRNES also commented that "Baez

has acquired the fundamental skills necessary to function effectively and efficiently as a first class

supervisor."

236.     On July 23, 2013, when Baez was applying for the MI-3 position that went to

Bedell, DePaulo told HR that:

> Baez has been acting as a team leader (supervisor) for at least
> 4 years [and] acted as a team leader in many cases specifically
> in pharmacy since 2009. One significant investigation that
> took place specifically was from 2010 through 2012.
> Investigator Baez was a team leader in a complex
> investigation involving a pharmacy audit/investigation. She
> also assisted the DA's office regarding their investigation and
> testified at the OMIG administrative hearing. As a result of

> her leadership and investigative skills in this case the provider was excluded from the Medicaid program and a criminal indictment and conviction was obtained by the DA's office.

237.  Prior to Coschignano becoming DMIG, Baez had never filed a complaint of discrimination or retaliation at any job.

### ii.  Baez's Lowered Evaluation Scores

238.  In an evaluation dated February 2, 2017, Baez received a rating of "satisfactory" from her supervisor Greg Waring and reviewer DRESSLER that contained false negative comments claiming Baez's work was often late, poorly done, and required extra supervision.[10]

239.  In contrast, Baez's 2016 evaluation from Waring contained glowing comments about Baez being an "excellent investigator" that is "highly effective" and "consistently submits outstanding casework resulting in successful investigations." Waring also wrote that Baez's "written and oral communications are of the highest order."

240.  Baez asked Waring why she received a glowing 2016 evaluation but a 2017 evaluation with negative comments.

241.  Waring admitted that he was pressured by DMI management, which included ROSEN, COYNE, and BYRNES, to give Baez negative evaluations.

242.  Waring also told Baez that he did not want to be involved in what DMI management was doing and implied that he was trying to leave OMIG as a result.

243.  On July 11, 2018, and after WARING had left OMIG, DRESSLER, acting under the same pressure from OMIG and DMI management like ROSEN, COYNE and BYRNES gave

---

[10] OMIG's annual performance evaluations include a final rating of either "satisfactory" or "unsatisfactory" along with a written narrative of the employee's performance.

Baez an "unsatisfactory" sixth month certification, meaning that if her performance did not improve, her 2018 performance would be rated "unsatisfactory" at the end of the evaluation period.

244.    Violating OMIG policy, Baez was never told or counseled in advance that she would be receiving an "unsatisfactory."

245.    For the final 2018 evaluation, given to Baez in January 2019, the final score was again "unsatisfactory" from her new supervisor, MAHONEY, and DRESSLER. Yet, MAHONEY had only supervised Baez for three or four months and falsely claimed that Baez was not doing her work.

246.    MAHONEY was at the mercy of OMIG management because of issues that could have justified his termination and, instead, resulted in a transfer from Albany to the NYC Office.

247.    Defendants also intentionally undercounted the number of cases Baez was handling or assisting on in order to unfairly criticize her performance.

248.    In August 2019, Baez again received an "unsatisfactory" sixth month certification.

249.    After this court partly denied summary judgment in *Doran I* on September 27, 2019, Defendants panicked about the pending trial and reversed their plan to terminate Baez and gave her a "satisfactory" on her 2019 evaluation, which she received in or around January 2020.

250.    ROSEN, COYNE, and BYRNES, with the assistance of MAHONEY and DRESSLER, ensured that Baez received negative evaluation feedback in retaliation for her continued pressing of the *Doran I* lawsuit and seeking their depositions.

251.    To date, the "unsatisfactory" rating remains in Baez's permanent State personnel file and will affect her ability to receive promotions and salary raises.

### iii. Baez's Promotion Denial No. 1:  Investigative Specialist 2

252.    In retaliation, Baez was denied promotion to the position of Investigative Specialist 2 (Grade 23), in favor of a less-qualified candidate who did not engage in protected activity.

253.    In or around September 2018, Baez applied for the Investigative Specialist 2 position in OMIG's NYC Office.

254.    The 2018 posting removed any requirement or preference for candidates with a degree in accounting, criminal justice, or a related field, which Baez had.

255.    The 2018 posting also reduced the requirement of 10 years' investigative experience to only 7.

256.    In or around October 2018, Baez was interviewed by MEYER and two auditors.

257.    MEYER was friends with former Medicaid Inspector General Cox, who Baez sued in *Doran I*, but claimed during the interview that he had not spoken to Cox recently.

258.    In or around November 2018, Baez learned that she was denied the position.

259.    OMIG, at the direction of COYNE, and with the approval of ROSEN, selected Mildred Palermo, who had only worked at OMIG a short period.

260.    Upon information and belief, Ms. Palermo has never engaged in protected activity at OMIG claiming discrimination.

261.    Unlike Baez, Ms. Palermo had a history of erratic office behavior that lead to substantiated workplace violence complaints, which OMIG, ROSEN, COYNE and Defendants refused to take any corrective action on.

**D.    Retaliation Against Plaintiff Shaporov**

    **i.    Shaporov's Employment Background**

262.    In February 2009, Shaporov joined OMIG as an MI-1 assigned to the Forensic Fraud Investigation Unit of the NYC Office.

263.    In May 2009, Shaporov was reassigned to the Health Care Fraud Prevention and Enforcement Action Team.

264.    In June 2009, based on his fine performance, Shaporov was again reassigned to the General Fraud Investigations Unit.

265.    In 2012, Shaporov was assigned to an FBI Task Force as the OMIG representative and received a Top Security clearance.

266.    In January 2014, Shaporov was promoted to MI-2 (now called an Investigative Specialist 1).

267.    Between August 2018 and January 2019, Shaporov was assigned to the U.S. Social Security Task Force.

268.    Since 2009, Shaporov has spent 70% of his time working on federal joint-agency task forces investigating Medicare fraud primarily in Brooklyn, which entails investigating cases with Federal Special Agents, conducting undercover operations, interviewing witnesses, translating, and preparing cases for grand juries or trials with Assistant U.S. Attorneys.

269.    The other 30% of Shaporov's time involves investigating Medicaid fraud cases like other OMIG employees, where he has for several years served as an acting team leader or supervisor when his direct supervisor is absent.

270.    Shaporov has also received awards and praise from federal investigators, Assistant U.S. Attorneys and agencies like U.S. Health & Human Services for his work as a field investigator

on joint taskforces. For example, one AUSA wrote that "Shaporov has been a tremendous asset to our prosecution []. Alex is tireless, enthusiastic, dedicated and a true team player." A Special Agent in Charge from the U.S. Department of State wrote that Shaporov "always goes above and beyond in assisting agents and developing new ideas and leads" and had an "outstanding performance."

### ii.  Shaporov's Promotion Denial No. 1:  Investigative Specialist 2

271.    In retaliation for *Doran I*, Shaporov was denied promotion to the position of Investigative Specialist 2 (Grade 23), a supervisory position, in favor of a less-qualified candidate who has not engaged in protected activity.

272.    In or around September 2018, Shaporov applied for the Investigative Specialist 2 position in OMIG's NYC Office.

273.    The 2018 posting removed any requirement or preference for candidates with a degree in accounting, criminal justice, or a related field, which Shaporov had.

274.    The 2018 posting also reduced the requirement of 10 years' investigative experience to only 7.

275.    In or around October 2018, Shaporov was interviewed by MEYER and two auditors.

276.    During the interview, Shaporov was questioned about why he even needed a supervisory position.

277.    In or around November 2018, Shaporov learned that he was denied the position.

278.    OMIG, at the direction of COYNE, and with the approval of ROSEN, selected Mildred Palermo, who had only worked at OMIG a short period.

279.    Upon information and belief, Ms. Palermo has never engaged in any protected activity at OMIG claiming discrimination.

280.    Unlike Shaporov, Ms. Palermo had a history of erratic office behavior that lead to substantiated workplace violence complaints, which OMIG, ROSEN, COYNE and Defendants refused to take any corrective action.

### iii. Continued Retaliation Against Shaporov

281.    On March 3, 2020, Shaporov was on travel orders driving through New Jersey in the course of his employment on his way to training in Albany, New York.

282.    Shaporov was operating a State-vehicle that OMIG owned, registered and maintained.

283.    Through no fault of his own, Shaporov received several driving tickets after being pulled over.

284.    One ticket was for illegally tinted windows, which was OMIG's fault.

285.    In retaliation for *Doran I*, Shaporov's request for assistance with the tickets was ignored by DRESSLER, with COYNE's participation.

286.    As a result, Shaporov was forced to hire an attorney at his own expense to dismiss unfounded charges against him for actions taken within the course of his employment.

287.    OMIG's policy is to provide free legal counsel to employees acting within the course of their employment – just like all the Defendants in *Doran I* that were represented by the New York State Office of the Attorney General.

### VII.    RETALIATION AGAINST ALL PLAINTIFFS:

### A.    Training Denials and Failure to Reimburse

288.    Since filing *Doran I*, OMIG has denied Doran and Shaporov training and also reimbursement for training that was authorized.

289.    Before the lawsuit, Doran's and Shaporov's requests for training were granted.

290.    Before the lawsuit, Doran and Shaporov were allowed to attend training without using vacation days and were reimbursed for expenses.

291.    After *Doran I*, Doran and Shaporov were, at times, forced to use vacation days and not reimbursed for expenses, unlike OMIG Upstate investigators who did not engage in or support protected activity.

**B.    180-Day Policy for Case Closures**

292.    In or around September 2018, OMIG, at the direction of COYNE and with ROSEN'S approval, imposed on Plaintiffs and investigators in DMI a new policy requiring that each NYC Office investigator must complete 15 priority cases within 180 days.

293.    At first, investigators in the Albany and Buffalo DMI offices were not subject to the policy.

294.    After a union grievance was filed, in or around October 2018, OMIG claimed that the 180-day policy would apply to all DMI offices – at least on paper.

295.    In reality, the 180-day policy was created to pressure, intimidate and give negative evaluations to NYC Office investigators, many of whom have filed lawsuits or internal discrimination grievances or have supported their colleagues' complaints.

296.    Even after OMIG was forced to include all offices, the 180-day policy is not enforced at non-NYC offices and is not used to pressure, criticize or downgrade the performance evaluations of Upstate Investigators.

297.    For example, Defendants intentionally undercounted the number of cases Baez was handling or assisting on in order to unfairly criticize her performance and give her an "unsatisfactory" as part of her 15 priority cases while ignoring the fact that Baez was handling or assisting on many other active Medicaid fraud cases.

298.    Defendants have also blocked Shaporov from partnering with his usual colleague to complete his 15 priority cases because they know Shaporov is required to have a partner and know that denying him his usual partner will interfere with his ability to comply with the 180-day policy.

C.    **Management Specialist 3 Promotion Denial**

299.    In or around May 2019, Defendants denied Plaintiffs the opportunity to apply and be considered for a promotion to Management Specialist 3, a supervisory position.

300.    The job is a triage position where the employee reviews Medicaid fraud cases, decides if they have merit and then assigns the case to DMI investigators.

301.    In or around mid-2019, Vladimir Polishnik was selected for the position and, upon information and belief, he had not engaged in or supported protected activity.

302.    Plaintiffs, as veteran investigators, were considerably more qualified for the position than the selected candidate, who lacks an investigation background or the necessary experience to review and assign Medicaid fraud cases.

**<u>Defendants' Actions Continue and Warrant Injunctive and other Relief</u>:**

303.    Defendants' actions were unlawful and violated Plaintiffs' rights under the U.S. Constitution as well as Federal laws such as the ADEA, Section 1983 and the Equal Protection Clause, the NYSHRL and NYCHRL.

304.    As a proximate result of Defendants' conduct, Plaintiffs have suffered and continue to suffer monetary loss and damages, including the loss of past and future earnings, and other employment benefits.

305.    As a further proximate result of Defendants' actions, Plaintiffs have suffered and continue to suffer from severe emotional distress, lasting embarrassment, humiliation and anguish, as well as other incidental and consequential damages and expenses.

306.    The individual Defendants' conduct is outrageous and malicious, was intended to injure Plaintiffs, and was carried out with reckless indifference to Plaintiffs' protected civil rights, entitling them to punitive damages.

307.    Plaintiffs have no complete, plain, clear or adequate remedy at law.

308.    Defendants must be restrained from further retaliation and discrimination against Plaintiffs and directed to stop their unlawful acts against Plaintiffs, who currently have applications for promotions pending and are thus being subject to ongoing and imminent injury.

309.    Defendants' acts against Plaintiffs continue.

310.    Plaintiffs believe that Defendants' unlawful acts against them will continue until this Court, by injunction and/or its judgment, compels otherwise.

## FIRST COUNT AGAINST DEFENDANT OMIG
### (Doran's Age Discrimination claim under the ADEA)

311.    Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

312.    As a proximate result of OMIG's conduct, Doran lost wages, benefits, promotional opportunities, and has incurred damages.

313.    Specifically, OMIG denied Doran promotion to the position of AMIG in 2019 because of his age.

314.    OMIG took the foregoing action to deprive Doran of equal employment opportunities and other contractual opportunities on account of his age.

315.    Based on the above, Doran suffered damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

## SECOND COUNT AGAINST DEFENDANT OMIG
### (Doran's Retaliation Claim under the ADEA)

316.    Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

317.    OMIG subjected Doran to differential terms and conditions of employment in retaliation for his protected activity, including:

> i.    Not promoting him to AMIG in 2019;
>
> ii.    Not promoting him to Manager of Medicaid Investigations in 2019;
>
> iii.    Not approving or subsidizing his training;
>
> iv.    Creating and imposing the 180-day policy, and;
>
> v.    Denying him the chance to apply to be a Management Specialist 3.

318.    Because of OMIG's deliberate actions, and as a proximate cause, Doran has been and continues to be denied his right under the ADEA.

319.    Based on the above, Doran suffered damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

## THIRD COUNT AGAINST
## ALL INDIVIDUAL DEFENDANTS[11]
### (Plaintiffs' Retaliation Claims pursuant to
### Section 1983 in violation of the Equal Protection Clause)

320.    Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

---

[11] The term "all individual defendants" means all defendants that are persons and does not include Defendant OMIG.

321.    Defendants' conduct was retaliation for Plaintiffs' discrimination complaints, including the filing of *Doran I* on the basis of race, color, and ancestry, and violated Plaintiffs' rights under the Equal Protection Clause pursuant to Section 1983.

322.    Based on the above, Plaintiffs each suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

## FOURTH COUNT AGAINST
## OMIG, ROSEN, COYNE, MULHALL and ARES
### (Doran's and Linn's Age Discrimination Claim
### in Violation of NYSHRL)

323.    Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

324.    OMIG, ROSEN and COYNE are "employers" as defined by the NYSHRL.

325.    As a proximate result of Defendants' conduct, Doran and Linn were denied promotion to AMIG in 2019 because of their age, in violation of the NYSHRL.

326.    Based on the above, Doran and Linn each suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

## FIFTH COUNT AGAINST
## OMIG, ROSEN, COYNE, MULHALL and ARES
### (Doran's and Linn's Age Discrimination Claim
### in Violation of NYCHRL)

327.    Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

328.    OMIG, ROSEN and COYNE are "employers" as defined by the NYCHRL.

329.    As a proximate result of Defendants' conduct, Doran and Linn were denied promotion to AMIG in 2019 because of their age, in violation of the NYCHRL.

330.    Based on the above, Doran and Linn each suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

## SIXTH COUNT AGAINST ALL DEFENDANTS
**(Retaliation against Plaintiffs in Violation of NYSHRL)**

331.    Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

332.    OMIG, ROSEN and COYNE are "employers" as defined by the NYSHRL.

333.    All the various actions Defendants took against Plaintiffs after they complained of discrimination were retaliation in violation of the NYSHRL.

334.    Based on the above, Plaintiffs each suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

## SEVENTH COUNT AGAINST ALL DEFENDANTS
**(Retaliation against Plaintiffs in Violation of NYCHRL)**

335.    Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

336.    All the various actions Defendants took against Plaintiffs after they complained of discrimination were retaliation in violation of the NYCHRL.

337.    By reason of the foregoing, Plaintiffs have each suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

## PUNITIVE DAMAGES

338.    By reason of the wanton, unrepentant, reckless and egregious conduct of the individual Defendants alleged, Plaintiffs claim punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that the Court:

a) Issue an order for the following preliminary injunctive relief:

    i.    Enjoining OMIG, ROSEN and Defendants from continuing with their policy and practice of classifying employees on the basis of age for purposes of promotion, salary increases and career advancement opportunities;

    ii.    Enjoining OMIG, ROSEN and Defendants from further withholding merit-based salary increases, promotion and career advancement opportunities to Plaintiffs who are over the age of 40 years.

b) Impanel a jury to hear Plaintiffs' claims;

c) Issue a judgment declaring that Defendants' policy and practice of disparate treatment of its employees who are over the age of 40 years is unlawful in that it violates the Equal Protection Clause pursuant to Section 1983, the ADEA, the laws of New York State and New York City;

d) Award compensatory damages in amounts that are fair, just and reasonable, to be determined at trial;

e) Award Plaintiffs attorneys' fees pursuant to 42 U.S.C. § 1988, the ADEA, the NYSHRL, and the NYCHRL;

f) Award all Plaintiffs costs of suit pursuant to 42 U.S.C. §§ 1920 and 1988; and,

g) Award such other and further relief as this Court may deem appropriate and equitable, including injunctive and declaratory relief as may be required in the interests of justice.

Dated: New York, New York
        May 14, 2020

                           Respectfully Submitted,

                           SAMUEL O. MADUEGBUNA (6084)
                           MADUEGBUNA COOPER LLP
                           Attorneys for Plaintiffs
                           30 Wall Street, 8th Floor
                           New York, NY 10005
                           (212) 232-0155

TO:     Defendants

       N.Y.S. OFFICE OF THE MEDICAID INSPECTOR GENERAL
       90 Church Street
       New York, NY 10007

       DENNIS ROSEN
       c/o N.Y.S. Office of the Medicaid Inspector General
       90 Church Street
       New York, NY 10007

       DANIEL COYNE
       c/o N.Y.S. Office of the Medicaid Inspector General
       90 Church Street
       New York, NY 10007

       EDWARD MICHAEL DRESSLER
       c/o N.Y.S. Office of the Medicaid Inspector General
       90 Church Street
       New York, NY 10007

       ROBERT BYRNES
       l/k/a N.Y.S. Office of the Medicaid Inspector General
       90 Church Street
       New York, NY 10007

       CHRISTOPHER MULHALL
       c/o N.Y.S. Office of the Medicaid Inspector General
       800 North Pearl Street
       Albany, NY 12204

       SEAN MAHONEY
       c/o N.Y.S. Office of the Medicaid Inspector General
       90 Church Street
       New York, NY 10007

       GABRIELLE ARES
       c/o N.Y.S. Office of the Medicaid Inspector General
       800 North Pearl Street
       Albany, NY 12204

       EDWARD J. MEYER
       c/o N.Y.S. Office of the Medicaid Inspector General
       90 Church Street
       New York, NY 10007

*UNITED STATES DISTRICT COURT*
*SOUTHERN DISTRICT OF NEW YORK*                    *Docket No.:*

---------------------------------------------------------------------------------------------------------------

*ROBERT DORAN, BERNARD LINN, MARIA BAEZ, and ALEXANDER SHAPOROV,*

*Plaintiffs,*

*-against-*

*NEW YORK STATE OFFICE OF THE MEDICAID INSPECTOR GENERAL, DENNIS ROSEN, DANIEL COYNE, ROBERT BYRNES, CHRISTOPHER MULHALL, EDWARD MICHAEL DRESSLER, SEAN MAHONEY, GABRIELLE ARES, EDWARD J. MEYER and JOHN and JANE DOES 1-5 (said names being fictitious, the persons intended being those who aided and abetted the unlawful conduct of the named Defendants),*

*Defendants.*
---------------------------------------------------------------------------------------------------------------

*COMPLAINT AND JURY DEMAND*

---------------------------------------------------------------------------------------------------------------

*Signature (Rule 130-1.1-a)*

_____

*Print name beneath*
*SAMUEL O. MADUEGBUNA, ESQ.*

_____

*Yours, etc.*

*MADUEGBUNA COOPER LLP*
*Attorneys for Plaintiffs*
*30 Wall Street, 8th Floor*
*New York, New York 10005*
*(212) 232- 0155*

*To: All Counsel of Record*

*Service of the within is hereby admitted on*

_____

*Attorneys for*